UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CHAZ O. GULLEY,                      :
      Plaintiff,                  :
                               :
      v.                          :     Case No. 3:15cv962(MPS)
                               :
CAPTAIN HALL, et al.,                :
      Defendants.                 :

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff, Chaz O. Gulley, is currently incarcerated at Northern Correctional Institution, in Somers, Connecticut.  He commenced this civil rights action *pro se* by filing a complaint naming Captain Hall, Correctional Treatment Officer Perry, Nurse Rosalee Walker[1] and Lieutenants Lenny Ogando and Michael Mahoney as defendants.  On June 29, 2015, the court dismissed all claims against defendants Hall and Perry pursuant to 28 U.S.C. § 1915A(b)(1) and concluded that the claims of excessive force would proceed against defendants Mahoney, Ogando and Walker in their individual capacities.  Defendants Mahoney, Ogando and Walker move for summary judgment.  For the reasons set forth below, the motion will be granted in part and denied in part.

## I.      Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is "entitled to judgment as a

---

[1]  Defendant Walker is listed as Medical Nurse Rose Walker in the complaint.  It is evident from defendant Walker's affidavit that her first name is Rosalee.  *See* Reply Supp. Mot. Summ. J, Ex. 5, ECF No. 45-5.

matter of law." Rule 56(a), Fed. R. Civ. P.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).  Thus, the party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Id.*

In reviewing the record, the court must "construe the evidence in the light most favorable to the non-moving party and… draw all reasonable inferences in its favor."  *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted).  If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, however, summary judgment is improper.  *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Where one party is proceeding *pro se*, the court reads the *pro se* party's papers liberally and interprets them "to raise the strongest arguments that they suggest."  *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citation omitted).  Despite this liberal interpretation, however, "[u]nsupported allegations do not create a material issue of fact"

and cannot overcome a properly supported motion for summary judgment.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), *cert. denied*, 540 U.S. 811 (2003).

## II.    Facts[2]

On May 5, 2015, the plaintiff was confined with another inmate in Cell H10 at MacDougall Correctional Institution ("MacDougall").   At that time, MacDougall was on a lockdown.  Correctional officers had searched the plaintiff's cell and confiscated items of the plaintiff's personal property, including his headphones.  The plaintiff had spoken to several prison officials regarding the confiscation of his property, but had been unsuccessful in securing the return of his items.

On May 6, 2015, the plaintiff learned from Captain Hall that he would not be receiving his headphones back.  The plaintiff requested to speak to Captain Black.   As he waited for Captain Black to arrive at his cell, the plaintiff began to hit the door of his cell and threw a chair against the door.  Lieutenant Mahoney arrived at the plaintiff's cell and talked to the plaintiff regarding the confiscation of his property.  When Lieutenant Mahoney left the area of the plaintiff's cell, the plaintiff covered the window of his cell door.

Captain Hall and Lieutenant Mahoney attempted to verbally persuade the plaintiff to comply with their orders to remove the covering from the window of his cell door.   The plaintiff

---

[2] The relevant facts are taken from defendants' Local Rule 56(a)1 Statement and Exhibits attached to the Local Rule 56(a)1 Statement [ECF Nos. 33-2 through 33-5], the Affidavits of Lieutenant Mahoney, [ECF No. 34], Lieutenant Ogando, ECF No. 45-4] and Nurse Walker, [ECF No. 45-5] and DVDs, ECF Nos. 45-1 through 45-3] and the plaintiff's Memorandum of Law, which includes what amounts to a combined Local Rule 56(a)2 Statement and Declaration and the attached Exhibits (referring to penalties of perjury at the beginning of the statement of facts and including plaintiff's signature at the end of the document), ECF No. 42. *See Willey*, 801 F.3d at 62 (requiring liberal interpretation of *pro se* pleadings).

refused to remove the window covering.  Lieutenant Mahoney summoned additional correctional

staff to come to the plaintiff's cell to attempt to convince him to remove the covering from the

window in his cell door.  Lieutenants Diaz and Sharp spoke to the plaintiff and attempted to

persuade him to remove the window covering, but were unsuccessful.  Mental health and

medical staff then attempted verbal intervention with the plaintiff, but he refused to take down

the covering over the cell window and indicated that he was done with programs and was

prepared to go to administrative segregation.

Lieutenant Mahoney spoke with medical staff to determine whether there were any

indications that a chemical agent should not be used on or near the plaintiff.   Medical staff stated

that there were no indications that a chemical agent could not be used on the plaintiff or the

plaintiff's cellmate, even though he had asthma.  Medical staff indicated that they would remain

in the area of the plaintiff's cell, in case an officer deployed a chemical agent into the cell and the

plaintiff's cellmate required immediate medical treatment.

Lieutenant Mahoney gave the plaintiff a final order to remove the obstruction covering

his cell door window, but the plaintiff refused to do so.  Lieutenant Mahoney administered a one-

second burst of a chemical agent under the cell door.  At the same time, Lieutenant Diaz was

stationed in an area next to the plaintiff's cell.  In that area, Lieutenant Diaz had access to a vent

into the plaintiff's cell which was not obstructed.  After Lieutenant Mahoney gave a last warning

to remove the obstruction over the window in the plaintiff's cell door, Lieutenant Diaz

administered a one-second burst of a chemical agent through the vent into the plaintiff's cell.

Lieutenant Mahoney and other correctional staff, including Captain Black, continued to

order the plaintiff to remove the obstruction from the window in his cell door, but the plaintiff

4

refused to do so.  Prison staff informed the plaintiff that if he chose not to remove the covering from the window, a staff member would deploy a chemical agent into the cell again.  Because the plaintiff refused to remove the obstruction over the window in his cell door, Lieutenant Mahoney administered a second one-second burst of a chemical agent under the cell door.   At that same time, Lieutenant Diaz also administered a one-second burst of a chemical agent through the vent into the plaintiff's cell.  The plaintiff did not remove the obstruction from his cell window.

After repeated orders from Captain Black and other prison staff, the plaintiff eventually uncovered the window.   After Captain Black learned that the plaintiff's door could not be opened because the plaintiff had wedged material into the door jamb, he made additional verbal efforts to persuade the plaintiff to unwedge the door.   The plaintiff refused and covered the window in the cell door again.   At that point, after directing the plaintiff to uncover the window, Lieutenant Mahoney administered another one-second burst of a chemical agent under the cell door.  Within several minutes, the plaintiff uncovered the window again.   A maintenance worker was called to pry the door open because the plaintiff could not or would not remove the material blocking the door jamb.

After the door had been opened, two correctional personnel entered the plaintiff's cell, handcuffed him and escorted him to the restrictive housing unit under the supervision of Captain Black.  Lieutenant Diaz escorted the plaintiff's cellmate out of the cell and over to medical personnel for assessment.   Lieutenant Diaz then escorted the plaintiff's cellmate to the medical department.  Medical personnel decontaminated the inmate from the residue of the chemical agent, provided him with clean clothes and administered a breathing treatment.

When the plaintiff reached the restrictive housing unit, officers placed the plaintiff in the shower to decontaminate him from the residue of the chemical agent.  The officers then escorted him to Cell 4, strip-searched him and applied in-cell restraints to his ankles, waist and wrists.  A medical staff member checked the restraints to ensure that they were not too tight.  A mental health staff member assessed the plaintiff and concluded that there were no contraindications to his placement on in-cell restraints.

On May 7, 2015, the plaintiff remained on in-cell restraints in Cell 4 in the restrictive housing unit.  At approximately 10:30 a.m., Lieutenant Ogando arrived at the plaintiff's cell because he had learned that the plaintiff had blocked the window in his cell door.  Lieutenant Ogando attempted to convince the plaintiff to remove the covering from the window of the door of his cell.  The plaintiff stated that he was protesting because had not been given a shower and had been fed baloney sandwiches, instead of a hot meal.  He refused to remove the obstruction from the window in his cell door and stated that he would continue his protest.

After approximately twenty-five minutes, Lieutenant Ogando issued a final warning to the plaintiff to remove the cell window covering and indicated that he would use a chemical agent if the plaintiff did not comply with his order.   The plaintiff did not comply and Lieutenant Ogando administered a one-second burst of a chemical agent through the trap in the cell door.  Lieutenant Ogando then directed officers to open the cell door and ordered the plaintiff to remain on his bunk.  Lieutenant Ogando and officers entered the cell.  The plaintiff was on the floor of the cell.  Two officers grabbed the plaintiff under his arms, raised him to his feet and escorted him out of the cell to the shower to be decontaminated from the residue of the chemical agent.

The same two officers escorted the plaintiff to the medical unit.  When the plaintiff arrived at the medical unit, the officers placed the plaintiff in a shower to be decontaminated from the residue of the chemical agent.  Lieutenant Ogando issued an order upgrading the plaintiff's restraint status from in-cell restraints to soft, four-point restraints because of the plaintiff's continued disruptive behavior.  Officers escorted the plaintiff to Medical Room 6, provided the plaintiff with new clothes and applied soft, four-point restraints to the plaintiff's ankles and wrists as he lay on a bunk in the cell.   Lieutenant Ogando supervised the application of restraints.

After all four restraints had been applied, Lieutenant Ogando and a medical staff member checked the space between the restraints and the plaintiff's ankles and wrists.  They both determined that there was ample space.  A mental health staff member assessed the plaintiff and concluded that there were no contraindications to his placement on four-point restraints.

Approximately thirty minutes later, a correctional officer summoned Lieutenant Ogando to the plaintiff's cell in the medical unit because he had managed to slip off one of the wrist restraints.  Officers re-attached the wrist restraint, checked the other restraints and applied a stationary strap over the upper part of the plaintiff's legs to restrict his movements.  Medical staff and Lieutenant Ogando checked the restraints for sufficient spacing and proper circulation.

Officers conducted range of motion exercises and restraint checks and readjustments at 1:00 p.m., 2:50 p.m, 3:15 p.m, 4:55 p.m., 6:30 p.m. and 8:50 p.m.  At 11:00 p.m., Lieutenant Ogando downgraded the plaintiff to in-cell restraints.

On May 11, 2015, at approximately 10:30 a.m., the plaintiff was cleared by a mental health clinician to be removed from Behavioral Observation Status.   Prison officials transferred

7

him from a cell in the medical unit to Cell 15 in the restrictive housing unit to serve disciplinary

sanctions.   As soon as officers left him in the cell alone, the plaintiff covered the window in the

cell door.  He refused initial orders to remove the window covering.   After verbal intervention

by staff members and the administration of a chemical agent through the trap in the cell door by

Lieutenant Mahoney, the plaintiff complied with orders to come to the trap in the cell door to be

handcuffed.  Two correctional officers and Lieutenant Mahoney eventually escorted the plaintiff

to Cell 4 in the restrictive housing unit and placed him on in-cell restraints.

At approximately 11:30 a.m., an officer observed that the plaintiff had placed a covering

over the window in his cell door and summoned Lieutenant Mahoney.  Very shortly after his

arrival at the plaintiff's cell, Lieutenant Mahoney administered a burst of a chemical agent

through the trap in the cell door.  Lieutenant Mahoney and two other officers entered the cell.   In

less than a minute, multiple other officers also entered the cell.  Two officers escorted the

plaintiff out of the cell to the shower to be decontaminated from the residue of the chemical

agent.  Those same officers then escorted the plaintiff to the medical unit and placed him in four-

point restraints.  Additional facts relating to specific claims are included in the discussion below.

## III.    Discussion

Defendants Walker, Mahoney and Ogando assert two arguments in support of their

motion for summary judgment.  They contend that they did not use excessive force against the

plaintiff on May 6, 2015, May 7, 2015, or May 11, 2015 and that they are entitled to qualified

immunity.

### A.    Nurse Rosalee Walker

The only allegations regarding Nurse Walker are that she checked the four-point

8

restraints that had been re-applied to the plaintiff on May 7, 2015, after he had slipped his wrist out of one of the restraints.   Nurse Walker has filed an affidavit indicating that she was not present at any time on May 7, 2015, during the application of restraints on the plaintiff's wrists and ankles.  *See* Reply Supp. Mot. Summ. J., ECF No. 45-5, Ex. 5, Walker Aff. ¶ 7.  Lieutenant Ogando did not ask her to check any restraints and she did not make any determination as to the spacing of restraints applied to the plaintiff's wrists and ankles on May 7, 2015.  *See id.*, Walker Aff. ¶¶ 8-9.

The plaintiff has offered no evidence to contradict this affidavit.  In opposition to the motion for summary judgment, he concedes that he mis-identified Nurse Walker as the nurse who performed the restraint assessment at the request of Lieutenant Ogando.   Because there are no disputed issues of fact with regard to Nurse Walker's involvement in or knowledge of the assessment of the plaintiff's restraints on May 7, 2015, the plaintiff has failed to establish that Nurse Walker violated his Eighth Amendment rights.  The motion for summary judgment is granted as to the claims against defendant Walker.

## B.     Excessive Force Claims against Remaining Defendants

The plaintiff asserts that on May 6, 2015 and May 11, 2015, Lieutenant Mahoney used excessive force against him and that on May 7, 2015, Lieutenant Ogando used two different types of excessive force against him.  The defendants argue that the affidavits and documentary and video evidence filed in support of their motion for summary judgment pertaining to the use of force by Lieutenants Mahoney and Ogando on the dates in question show that the force used was not excessive and did not violate the Eighth Amendment.

In *Hudson v. McMillian*, 503 U.S. 1 (1992), the Supreme Court established the minimum

standard to be applied in determining whether force by a correctional officer against a sentenced inmate states a constitutional claim under the Eighth Amendment.  When an inmate claims that excessive force has been used against him by a prison official, he has the burden of establishing both an objective and a subjective component to his claim.  *See Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

To meet the objective component, the plaintiff must show that the defendant's conduct was serious enough to have violated "contemporary standards of decency."  *Hudson*, 503 U.S. at 8 (internal quotation marks and citation omitted).  The extent of the plaintiff's injuries as a result of the defendant's conduct is not a factor in determining the objective component.  *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) ("core judicial inquiry" is "not whether a certain quantum of injury was sustained," but rather whether unreasonable force was applied given the circumstances); *Hudson*, 503 U.S. at 9 ("[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated" irrespective of whether significant injury is present).   Even *de minimis* uses of force are unconstitutional if they are "repugnant to the conscience of mankind." *Id.* at 10-11 (internal quotation marks and citations omitted).

The subjective component requires the inmate to show that the prison officials acted wantonly.  The use of excessive force does not in and of itself establish malice or wantoness for purposes of the subject component.   Instead, "the inmate must show that the prison officials acted "maliciously and sadistically to cause harm . . . ." *Id.* at 7.  The subjective component focuses on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*  (citing *Whitley v. Albers*, 475 U.S. 312, 320-

321 (1986)).  The court considers factors including "the need for application of force, the

relationship between that need and the amount of force used, the threat reasonably perceived by

the responsible officials, and any efforts made to temper the severity of a forceful response."  *Id.*

(internal quotations and citation omitted).   The court may also consider the extent of an inmate's

injuries as a factor in determining whether a prison officer thought the use of force was necessary

in the situation or instead demonstrated an intentional and unjustified infliction of harm.  *Id.*

### 1.        Use of Force – May 6, 2015

The plaintiff alleges that on May 6, 2015, Lieutenant Mahoney used a chemical agent

against him unnecessarily.  Lieutenant Mahoney argues that the force used was necessary given

the plaintiff's repeated refusal to comply with orders.

The Supreme Court has held that prison officials should be given "a wide range of

deference" with regard to their efforts in "preserv[ing] discipline and security."  *Whitley*, 475

U.S. at 321-22.  Courts within the Second and other Circuits have held that the use of a chemical

agent is not an unacceptable means of gaining control of an inmate who is disruptive.  *See, e.g.*,

*Scroggins v. Davis*, 346 F. App'x 504, 505 (11th Cir. 2009) (use of chemical agent to subdue

high-risk inmate was not excessive); *Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir. 2002) (the

use of chemical agents alone does not constitute "malicious or sadistic" action); *Soto v. Dickey*,

744 F.2d 1260, 1271 (7th Cir. 1984) ("the chemical agent was used for failure of the inmate to

obey a direct order and the use of mace was a reasonable response to the institution's legitimate

security concern"); *Carolina v. Pafumi*, No. 3:12-CV-163 VLB, 2013 WL 1673108, at *8-10 (D.

Conn. Apr. 17, 2013) (use of chemical agent to subdue noncompliant inmate did not constitute

excessive force); *Reeder v. Hogan*, No. 9:09-CV-520 NAM/ATB, 2013 WL 2632600, at *5

(N.D.N.Y. June 11, 2013) (use of chemical agent constituted force that was necessary "to restore discipline and subdue plaintiff, who was aggressively refusing to comply with orders" to exit cell peacefully); *Alston v. Butkiewicus,* No. 3:09-CV-207, 2012 WL 6093887, at *13-15 (D. Conn. Dec. 7, 2012) (use of chemical agent did not constitute excessive force when inmate refused to comply with direct orders); *Green v. Morse,* No. 00-CV-6533-CJS, 2009 WL 1401642, at *9-13 (W.D.N.Y. May 18, 2009) (use of chemical agent on inmate who refused to leave his cell did not constitute excessive force).

It is undisputed that on May 6, 2015, the plaintiff had covered the window in his cell door and that correctional staff could not observe what was going on in the cell. The video evidence reflects that the plaintiff refused to uncover the window in the cell door despite many orders to do so from correctional staff as well as medical and mental health staff. *See* Reply Supp. Mot. Summ. J., Ex. 2, DVD, ECF No. 45-2. The video footage reflects that for at least eighteen minutes, multiple attempts were made to persuade the plaintiff to remove the window covering in an effort to avoid the use of any kind of force against the plaintiff. *See id.* The plaintiff would not remove the covering. The plaintiff was aware that his cellmate had asthma and that his exposure to a chemical agent might cause him harm. *See id.* Lieutenant Mahoney utilized a burst of a chemical agent under the door to the plaintiff's cell in an effort to make the plaintiff comply with orders to remove the covering from the cell door window. *See id.* The plaintiff refused to remove the obstruction from his window.

For approximately four minutes, additional verbal efforts were made by correctional staff, including Captain Black, to convince the plaintiff to comply with orders to remove the window covering. Because these efforts were unsuccessful and the first burst of a chemical

agent had not achieved the desired effect of making the plaintiff change his mind about removing the window covering, Lieutenant Mahoney utilized a second burst of a chemical agent. *See id.* After about three minutes, Captain Black was able to persuade the plaintiff to comply with his orders to remove the cell obstruction over the window. *See id.*

It then became apparent that the plaintiff had wedged the door shut using some kind of paper material and the door could not be opened by correctional staff. *See id.* In response to Captain Black's requests that the plaintiff remove the material from the door jamb, the plaintiff covered the window in the cell door again. *See id.* At that point, after directing the plaintiff to uncover the window, Lieutenant Mahoney administered another one-second burst of a chemical agent under the door. Within minutes, the plaintiff uncovered the window again. *See id.* Correctional staff called a maintenance worker to the scene and he was able to pry open the door to the plaintiff's cell. *See id.* The plaintiff then peacefully submitted to handcuffs and to being escorted to the restrictive housing unit. *See id.*

The video evidence documents the initial, extensive verbal efforts of correctional, medical and mental health staff members to persuade the plaintiff to comply with orders and to remove the window covering. By covering the window to the cell and blocking the view into the cell by correctional officials, the plaintiff put his safety, his cellmate's safety and the safety of staff at risk and interfered with the security and order of the prison facility. Prior to the use of a chemical agent, Lieutenant Mahoney confirmed with medical staff that there were no contraindications for the use of a chemical agent on the plaintiff and that medical staff would remain on the scene to treat the plaintiff's cellmate, who suffered from asthma, if necessary.

13

In view of the fact that the plaintiff disregarded repeated orders and all efforts of correctional staff, including Lieutenant Mahoney, to persuade him to remove the window obstruction, the court concludes that deploying a chemical agent in singular bursts into the plaintiff's cell on three separate occasions constituted force that was necessary to restore order and ensure the safety and security of the plaintiff, his cellmate and prison staff. It was not used for the purpose of causing harm to the plaintiff, but rather to avert the necessity to use hands-on force to remove the plaintiff from his cell. The video evidence reflects that when the plaintiff finally complied with the order to remove the window covering and assumed a position on his knees with his hands behind his back, correctional staff ceased the use of a chemical agent. The plaintiff has offered no evidence to contradict the legitimate need for the degree of force used by Lieutenant Mahoney in response to the safety and security issues that were present due to the inability of prison staff to view the inside of the plaintiff's cell.

Accordingly, after considering all the evidence in the record regarding the use of force by Lieutenant Mahoney on May 6, 2015, the court concludes that defendant Mahoney has demonstrated an absence of a genuine issue of material fact and his entitlement to judgment as a matter of law regarding this incident. The evidence submitted by the defendants shows that the force used by Lieutenant Mahoney, three bursts of pepper spray under the door of the plaintiff's cell, was used to gain the plaintiff's compliance with lawful orders that were reasonably related to restoring order, ensuring the safety of staff and inmates and maintaining security within the institution rather than to inflict harm upon the plaintiff. No reasonable juror could find from the evidence in the record that defendant Mahoney violated the plaintiff's Eighth Amendment rights

14

as a result of the degree of force used on May 6, 2015.   Therefore, the motion for summary judgment is granted as to that claim.

### 2.      Uses of Force – May 7, 2015

The plaintiff alleges that Lieutenant Ogando used a chemical agent against him unnecessarily and directed officers to apply four point restraints to his ankles and wrists too tightly.   Lieutenant Ogando argues that the force used was necessary given the circumstances.

### a.      Chemical Agent

At approximately 10:30 a.m. on May 7, 2015, the plaintiff covered the window in his cell door.  *See* Ogando Aff. ¶ 8, ECF No. 45-4.   At that time, the plaintiff was on in-cell restraints in Cell 4 in the restrictive housing unit.  *See* Mem. Supp. Mot. Summ. J., ECF No. 33-2, Ex. A at 19.  The plaintiff concedes that the view into his cell by correctional staff was obstructed by the window covering.

When Lieutenant Ogando arrived at the plaintiff's cell, he ordered the plaintiff to remove the window covering, but the plaintiff refused to do so.  *See id.*  For twenty-five minutes, Lieutenant Ogando attempted to persuade the plaintiff to comply with his orders to remove the obstruction over the window in the door of his cell, but the plaintiff stated that it was his intention to continue his disruptive, non-compliant and unsafe behavior until he got what he wanted.  *See id.*  At 11:00 a.m., Lieutenant Ogando directed Lieutenant Colon to begin to videotape his interactions with the plaintiff.  *See* Ogando Aff. ¶ 10, ECF No. 45-4; Reply Supp. Mot. Summ. J., Ex. 3, ECF No. 45-3, DVD.

The plaintiff continued to refuse to remove the window covering, despite Lieutenant Ogando's orders to do so.  *See* Reply Supp. Mot. Summ. J., Ex. 3, ECF No. 45-3, DVD.  The

plaintiff claimed to be protesting the fact that he had received a cold sandwich for his last meal instead of a hot meal and had not been permitted to shower for seven days.  *See id.*

The plaintiff does not dispute that he refused to uncover his window in response to Lieutenant Ogando's orders.  He contends, however, that Lieutenant Ogando sprayed a chemical agent into his cell unnecessarily in response to his non-violent protest.

The videotape of the incident suggests that the plaintiff had no intention of uncovering the window because it was part of his protest against prison conditions.  *See id.*  Lieutenant Ogando made clear that a chemical agent would be used if the plaintiff continued to refuse to comply with his orders.  *See id.*  Lieutenant Ogando then observed through the trap in the cell door that the plaintiff had wrapped a sheet around his head.  *See id.*  He ordered the plaintiff one more time to remove the window covering, but the plaintiff refused to comply.  *See id.*  After confirming with the medical department that the use of a chemical agent was not contraindicated, Lieutenant Ogando administered a one-second burst of a chemical agent into the cell through the trap in the door.  *See id.*

After approximately twenty seconds, Lieutenant Ogando asked the plaintiff if he would comply with his orders to remove the window covering, but the plaintiff refused to respond.  *See id.*  Lieutenant Ogando then entered the plaintiff's cell with four other correctional officers.  *See id.*  The plaintiff was sitting on the floor next to the sheet from his bunk.  *See id.*  Two officers raised the plaintiff up from the floor to a standing position and escorted him to the shower to be

decontaminated and then to the medical unit.[3]

In response to the motion for summary judgment, the plaintiff claims that the use of a chemical agent was unnecessary because he was in handcuffs and leg shackles at the time. Lieutenant Ogando argues that the force used, a one-second burst of a chemical agent, was reasonable in response to the plaintiff's repeated refusals to comply with orders to remove the window covering and necessary to subdue and gain compliance from the plaintiff and protect his well-being. The videotape and Incident Report completed by Lieutenant Ogando demonstrate that the use of force by Lieutenant Ogando was in compliance with Department of Correction procedures. State of Connecticut Department of Correction Administrative Directive 6.5(7)(D) includes factors to be considered by prison officials prior to using a chemical agent. *See* Mem. Supp. Mot. Summ. J., ECF No. 33-4, Ex. C at 6. Lieutenant Ogando considered the factors before utilizing the chemical agent.

The plaintiff has offered no evidence to contradict the video evidence, Lieutenant Ogando's affidavit or the other documentary evidence submitted by the defendants in support of their motion for summary judgment. Defendant Ogando has met his burden of demonstrating

---

[3] The plaintiff's memorandum in opposition to the motion for summary judgment includes an allegation that the officers "escorted – dragged" him to the shower and to the medical unit. *See* Mem. Opp'n Mot. Summ. J., ECF No. 42 at 3, ¶¶ 12-13. As a preliminary matter, this allegation is not in the complaint and the officers who escorted him to the shower and to the medical unit are not defendants in this action. In addition, the video of the escort does not support the plaintiff's characterization of it. Because the plaintiff was wearing leg shackles at the time of the escort, it is apparent from the video that it was somewhat difficult for him to walk. The plaintiff had no difficulty ambulating to the shower across from his cell in the restrictive housing unit. Although it appeared that he could not keep up with the pace of the officers as they escorted him from the shower to the medical unit for the first few steps, he was able to keep up for the rest of the escort to the medical unit without difficulty. *See* Reply Supp. Mot. Summ. J., Ex. 2, ECF No. 45-2, DVD.

that there is no dispute as to a genuine issue of fact regarding the degree, nature and basis of the force used in response to the plaintiff's non-compliance with orders and that he is entitled to judgment as a matter of law as to the use of a chemical agent on May 7, 2015.   The motion for summary judgment is granted as to that claim.

### b.       Four-Point Restraints

After the officers escorted the plaintiff to the medical unit, Lieutenant Ogando issued an order that the plaintiff be upgraded to four point stationary restraints because he continued to make threats to engage in disruptive and unsafe behavior.   The plaintiff contends that Lieutenant Ogando directed officers to apply the four point restraints too tightly to his wrists and ankles "out of spite."  Compl. at 3.

The video evidence and Incident and Medical Reports offered by the defendants demonstrate that after the initial placement of restraints on the plaintiff's wrists and ankles, at approximately 11:20 a.m., Lieutenant Ogando and a medical staff member checked to make sure there was sufficient space between the restraints and the plaintiff's wrists and ankles.   *See* Reply Supp. Mot. Summ. J., Ex. 3, ECF No. 45-3, DVD; Mem. Supp. Mot. Summ. J., Ex. A at 52, ECF No. 33-2; Ogando Aff. ¶ 21.  The plaintiff made no complaints about the tightness of the restraints at any time during the initial application of the restraints.   *See* Reply Supp. Mot. Summ. J., Ex. 3, ECF No. 45-3, DVD.  Within thirty minutes of the initial placement of the plaintiff in restraints, he had slipped out of one of the wrist restraints.   *See id.*; Ogando Aff. ¶ 22.

At approximately 11:50 a.m., Lieutenant Ogando supervised the re-application and re-adjustment of the restraints.  *See id.*; Ogando Aff. ¶ 23.  In addition, he authorized the application of a strap over the upper part of the plaintiff's legs to inhibit his movement.  *See id.*  After the

restraints were re-applied, a medical staff member checked the spacing between the restraints and the plaintiff's ankles and wrists and found the spacing to be sufficient. *See id.*; Ogando Aff. ¶ 24. The plaintiff made no verbal complaints at that time regarding the restraints being too tight. *See* Reply Supp. Mot. Summ. J., Ex. 3, ECF No. 45-3, DVD.

Approximately one hour later at 1:00 p.m., Lieutenant Ogando supervised officers conducting range of motion exercises and re-adjustment of the restraints. *See id.* At that time, a nurse took the plaintiff's vital signs and checked to make sure there was sufficient circulation in the plaintiff's feet and hands. *See id.*

The nurse initially found it difficult to find a location to take the plaintiff's pulse because of the placement of the restraints on the plaintiff's wrists and the fact that there was very little space between the restraint and the location where a pulse is usually taken. *See id.* The nurse ultimately was successful in taking the plaintiff's vital signs including the pulses on both wrists and ankles. *See* Mem. Supp. Mot. Summ. J., Ex. A at 55, Medical Incident Report, ECF No. 33-2.

The plaintiff made no complaints about the tightness of the restraints until he heard the nurse who was trying to take his vital signs state that she was having difficulty because of the placement of the restraints. *See* Reply Supp. Mot. Summ. J., Ex. 3, ECF No. 45-3, DVD. The plaintiff commented that the nurse had found the restraints to be too tight and that she was suggesting that the restraints should be loosened. *See id.*

In response to the concerns of plaintiff and the nurse regarding the tightness of the restraints, Lieutenant Ogando checked the spacing of the restraints himself and found the spacing to be sufficient. *See id.* In addition, another nurse came in to check the spacing and found it to

be sufficient.  *See id.*  The plaintiff did not otherwise comment or complain about the tightness of the restraints at that time.  *See id.*

The Incident and Medical Incident Reports reflect that correctional officers and medical personnel checked and readjusted the plaintiff's restraints on five more occasions until Lieutenant Ogando ordered the plaintiff to be downgraded to in-cell restraints at 11:00 p.m.  *See* Mem. Supp. Mot. Summ. J., Ex. A at 29-43, 53-56, ECF No. 33-2.  There are no notations of complaints by the plaintiff regarding the restraints in the Incident or Medical Incident Reports addressed to the time period during which he was confined in four point restraints.  *See id.*  Nor are there any statements made by Lieutenant Ogando on the videotape to suggest that he directed the officers to apply the restraints more tightly than was necessary.  *See* Reply Supp. Mot. Summ. J., Ex. 3, ECF No. 45-3, DVD.

In opposition to the motion for summary judgment, the plaintiff states that he suffers from numbness and pain in his right hand, back and ankle areas and takes 1200 mg of Neurontin in the morning and in the evening.  He also claims that he was housed in the medical unit for further medical observation from May 8, 2015 until May 11, 2015.  *See* Mem. Opp'n Mot. Summ. J., ECF No. 45 at 3, ¶ 17; Compl., ECF No. 1 at ¶ 19.

Although an inmate's injuries from the use of force may be considered in determining whether the use of force demonstrated the unjustified infliction of harm rather than a means necessary to restore or maintain security or order, the plaintiff has not submitted evidence to support his claim that the numbness and pain in his right hand and ankles were the result of the use of four point restraints on May 7, 2015.  He has filed no medical records or reports linking

the use of four point restraints on May 7, 2015 to the alleged numbness and pain in his right hand and ankles.

With regard to the plaintiff's allegation that he had remained on observation for medical issues after his release from all restraints on May 8, 2015 until May 11, 2015, Incident Reports reflect that prison officials had placed the plaintiff on Behavior Modification Status during that time. *See* Mem. Supp. Mot. Summ. J., ECF No. 33-3, Ex. B at 4-5, 8. Behavior Modification Status ("BOS") is defined as: "An intervention, determined by a qualified mental health professional, to extinguish maladaptive behaviors while maintaining the safety and security of the inmate." *See* State of Connecticut Administrative Directive 9.4(3)(F) which may be found at: http://www.ct.gov/doc/LIB/doc/PDF/AD/ad0904.pdf. On May 11, 2015, a mental health official approved the plaintiff's removal from BOS and his transfer to a restrictive housing unit. *See* Mem. Supp. Mot. Summ. J., ECF No. 33-3, Ex. B at 4-5, 8. Thus, it is apparent that the plaintiff's confinement in the medical unit after the removal of the four-point restraints was due to mental health issues rather than medical issues that might have been related to injuries the plaintiff claims that he suffered to his wrists and ankles.

There are no facts from which it could be inferred that Lieutenant Ogando ordered the re-application or adjustment of the restraints to the plaintiff's wrists and ankles in an excessively tight manner. Nor are there facts to suggest that Lieutenant Ogando's decisions or orders with regard to the re-application or adjustment of the plaintiff's restraints were issued for a malicious purpose or with the intent to cause the plaintiff harm. Even if the officers re-applied the restraints more tightly at 1:00 p.m. on May 7, 2015, this decision was justified by the fact that the plaintiff had managed to slip out of the restraints earlier that day, after they were initially applied

21

that morning.  Accordingly, defendant Ogando has met his burden of demonstrating that there are no genuine issues of disputed fact with regard to either the objective or subjective elements of the Eighth Amendment excessive force standard and that he is entitled to judgment as a matter of law as to the claim against him regarding the force used on May 7, 2015 in connection with the re-application of four-point restraints.  The motion for summary judgment is granted as to that claim.

### 3.    Use of Force – May 11, 2015

The plaintiff does not dispute that on May 11, 2015, while he was confined in Cell 4 in the restrictive housing unit at MacDougall, he covered the window in his cell door.  He argues that he was not trying to harm himself in the cell and that there was no legitimate basis for Lieutenant Mahoney's decision to deploy a chemical agent into the cell or into his face.

The videotape of this incident has no audio and is shot from an angle that does not permit the viewer to see the trap in the cell door or the inside of the cell.   *See* Reply Supp. Mot. Summ. J., Ex. 1, ECF No. 45-1, DVD.  The video depicts an officer viewing the covering on the window in the door of the plaintiff's cell, the officer using his radio, presumably to summon other correctional staff, the arrival of Lieutenant Mahoney, both the officer and Lieutenant Mahoney bending down in front of the cell and out of view of the camera, another correctional staff member arriving at the cell and then all three staff members entering the cell.  *See id.*  Other correctional personnel arrive at the cell, some enter the cell and some remain outside.   *See id.*  Two officers escort the plaintiff out of the cell across the hall and off camera.   *See id.*  Within a few seconds, officers escort him in another direction beyond the view of the camera.   *See id.*

Lieutenant Mahoney avers that when he arrived at the plaintiff's cell at approximately 11:30 a.m. on May 11, 2015, he and Officer Bertholet were able to view the plaintiff through the trap in the cell door.  *See* Mahoney Aff., ¶¶ 30-31, ECF No. 34 at 4.   They observed the plaintiff lying under his bunk and moving his head up and down in what appeared to be an attempt to hit his head on the floor of the cell.  *See id.* at ¶ 31.  Lieutenant Mahoney gave several orders to the plaintiff to stop attempting to harm himself, but the plaintiff refused to comply.  *See id.* at ¶¶ 32-33.  Lieutenant Mahoney avers that in an attempt to stop the plaintiff from further self-harm, he administered a one-second burst of a chemical agent into the cell through the trap in the cell door.  *See id.* at ¶ 33.  He then entered the cell with Officer Bertholet and Officer Lashaway and secured the plaintiff.  *See id.* at ¶ 34.

The plaintiff declares that earlier in the day on May 11, 2015, Lieutenant Mahoney had threatened to falsely accuse him of banging his head in order to justify the deployment of a chemical agent into his face.  *See* Compl., ECF No. 1 at ¶ 20; Mem./Decl., ECF No. 42 at ¶ 20.  The plaintiff claims that he was not trying to hit his head on the floor of Cell 4 when Lieutenant Mahoney looked through the trap of the cell door at him.  *See* Mem./Decl., ECF No. 42 at ¶ 20.  The plaintiff declares that Lieutenant Mahoney sprayed a chemical agent into the cell through the trap in the cell door and then entered the cell and sprayed a chemical agent directly into his face.  *See id.*

Due to the absence of video footage depicting what Lieutenant Mahoney might have observed through the trap of the cell door and what occurred in the cell after Lieutenant Mahoney entered it, the court concludes that there are issues of material fact in dispute with regard to whether the force used by Lieutenant Mahoney was administered in a good faith effort

23

to restore order or discipline or maliciously to cause harm to the plaintiff.   The issues of fact include whether the plaintiff was attempting to harm himself or reasonably could have been viewed as attempting to harm himself, whether sufficient efforts were made to avert the use of a chemical agent and whether Lieutenant Mahoney unnecessarily deployed a burst of a chemical agent into the cell and/or directly into the plaintiff's face after entering the cell.  *See Hudson*, 503 U.S. at 10-11 (courts must consider factors including "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response" to determine whether the force used was excessive).  These issues of fact preclude a finding that Lieutenant Mahoney is entitled to judgment as a matter of law with regard to the incident involving the use of force against the plaintiff in Cell 4 in the restrictive housing unit at approximately 11:30 a.m. on May 11, 2015.   The motion for summary judgment is denied as to that incident.

## C.    Qualified Immunity

The defendants argue that even if the evidence demonstrates that they violated the plaintiff's Eighth Amendment rights, they are entitled to qualified immunity because they acted in an objectively reasonable manner during each incident.   The court considers this argument only with regard to the remaining claim against Lieutenant Mahoney involving the use of force on May 11, 2015.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

(quoting *Harlow v, Fitzgerald*, 457 U.S. 800, 818 (1982)).  An official is entitled to qualified immunity if (1) the facts alleged or shown by the plaintiff state a violation of a statutory or constitutional right by the official and (2) the right was clearly established at the time of the challenged conduct.  *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted).  The Supreme Court has held that district courts have the discretion to choose which of the two prongs of the qualified immunity standard to decide first in view of the particular circumstances surrounding the case to be decided.  *See Pearson*, 555 U.S. at 236.

Under the second prong, a right is clearly established if, "at the time of the challenged conduct . . . every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 731, 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  There is no requirement that a case have been decided that is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "[A] broad general proposition" does not constitute a clearly established right.  *Reichle v. Howards*, 566 U.S. 658, 132 S. Ct. 2088, 2094 (2012).  Rather, the constitutional right allegedly violated must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Id.* (quoting *Anderson*, 483 U.S. at 640).

At the time of the incident in May 2015, it was clearly established that force may be used to maintain or restore discipline, but may not be used "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 9 ("[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated" irrespective of whether significant injury is present).  As indicated above, the court has concluded that defendant

Mahoney has failed to demonstrate the absence of a genuine issue of material fact with regard to the May 11, 2015 incident.

The defendants argue that even if the plaintiff had asserted sufficient facts to support a violation of his constitutional rights, their actions were objectively reasonable based on the particular facts of this case. The defendants offer little discussion with regard to the reasonableness of Lieutenant Mahoney's conduct on May 11, 2015. The court has concluded in the previous section of this ruling with regard to May 11, 2015 incident involving Lieutenant Mahoney that there are issues of fact that are in dispute with regard to the reasonableness of defendant Mahoney's actions as well as the need for force, any attempts to temper the amount of force used and whether the amount of force used was proportional to the need for force. The same issues of fact preclude a finding that defendant Mahoney is entitled to qualified immunity. *See Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) (issues of material fact which existed as to the excessive force claim precluded summary judgment based on a qualified immunity defense); *Maye v. Vargas*, 638 F. Supp. 2d 256, 262 (D. Conn. 2009) ("Although qualified immunity is a question of law, because issues of reasonableness depends on facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted.") (citing *Zellner v. Summerlin*, 494 F. 3d 344, 368 (2d Cir. 2007*)); Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 542 (S.D.N.Y. 2005) ("same genuine issues of material fact that preclude summary judgment on plaintiff's excessive force claim, also preclude application of defense of qualified immunity at the summary judgment stage"). For example, defendant Mahoney would likely not be entitled to qualified immunity if the evidence ultimately shows that during the May 11, 2015 incident, the plaintiff was not attempting to harm himself

and defendant Mahoney administered a burst of a chemical agent directly into the plaintiff's cell and into the plaintiff's face without first attempting to avert or temper that use of force.

Defendant Mahoney has not met his burden of demonstrating the absence of a genuine dispute as to a material fact with regard to qualified immunity in connection with the use of force during the May 11, 2015 incident. Accordingly, the motion for summary judgment is denied on the ground that defendant Mahoney is entitled to qualified immunity.

## IV.    Conclusion

The Motion for Summary Judgment [**ECF No. 33**] is **GRANTED** as to all claims against defendants Rosalee Walker and Lieutenant Ogando and as to the claim against defendant Mahoney involving the use of chemical agent on May 6, 2015.   The Motion [**ECF No. 33**] is **DENIED** as to the claim of excessive force involving the use of a chemical agent by defendant Lieutenant Mahoney on May 11, 2015.

The Court refers this case to the Honorable Donna F. Martinez for mediation. The clerk is instructed to appoint pro bono counsel for the plaintiff solely for the purpose of the mediation. The joint trial memorandum is due 60 days from any unsuccessful conclusion of the mediation.

SO ORDERED this 21st day of March 2017, at Hartford, Connecticut.

              /s/
              Michael P. Shea
              United States District Judge